Per Ouriam.
It appeared upon the record in this cause, that on the 3d day of August, 1807, John Gilliam made an entry of 200 acres, his occupant claim; that on the same 3d day of August, 1807, Daniel Morris made an entry of 200 acres, his occupant claim ; that the number of Gilliam’s entry was 15, and the number of Morris’s entry 33 ;that Morris caveated the entry of Gilliam, which was certified by the principal surveyor to the County Court of Franklin, removed from thence by certiorari to the District Court of Winchester, and transferred from thence to the Circuit Court of Franklin County. And at the August term, of said ' court, 1814, a jury found the following facts, to wit: “ That no conditional line was agreed to ly the parties.” And the following facts were agreed on by the counsel: “ That in February, 1806, the caveatee, who resided in East Tennessee, came to see the country, and was on the land in controversy after the caveator had been on it, and had put the initials of his name on a tree, cut some poles at it, and directed his son John and a Mr. Deloach to build him a cabin on said land; that on the 20th of February, 1806, and before any cabin was built, the caveator, who resided on Stone’s River, returned to the place, and cut a set of house logs, made rails, built a pen, and sowed some seed in it, and cleared about three quarters of an acre of land ; that John Gilliam, junior, afterwards went there and built a cabin with the logs that the caveator had cut; that about the 20th of March, 1806, the caveator moved with his family upon the land, and found John Gilliam, junior, living in the cabin ; that the caveator moved into the cabin with the said John Gilliam, junior; that they afterwards fell * out, and the caveator was compelled, by the superior force of the said John Gilliam, junior, to move between 80 and 100 yards to the place where he claims his preference right; that the caveator was seated on, and in actual possession of the place where he now lives, at and before the first of May, 1806, which place, and the improvements thereon, made on the said first day of May, 1806, was in the centre of his survey; that the caveator’s survey includes *136 the land in controversy; that before the caveator left the cabin. built by John Gilliam, junior, to wit, on the 10th of April, 1806, his brother, Lemuel Gilliam, came out with a negro of his father’s, and lived that summer with his brother John in said cabin, and made corn there, and at another place about a quarter of a mile off; that John Gilliam, junior, had another improvement about three quarters of a mile off, which he afterwards sold ; that the caveatee resided in East Tennessee till January, 1807, when he moved to the cabin his son John had built, and enjoyed the benefit of the crop made by his son Lemuel at that place; that John Gilliam, junior, claimed the land where the cabin was, under a grant to Russell, and agreed with the caveator, when the caveator left the cabin built by the said John, that if he did not establish his claim under the grant, he, John, would relinquish all his right of a preference to the caveator; that the said Lemuel was under age, and the work he did was for his father; and that he claimed no right of occupancy for himself; that the caveatee’s improvement was not included in the centre of his survey ; that Lemüel Gilliam was seated on and in actual possession of the place where the cabin was, at and before the first day of May, 1806, under the direction of the caveatee aforesaid.”
It further appeared from the record, that the interference of the two tracts amounted to 57 acres, 105 square poles; that at the February term of said court, upon the above case and the argument of counsel, * it was ordered by the court that the caveat be dismissed and the caveatee recover his costs, &c.,from which judgment the caveator took his appeal in nature of a writ of error to this court. Three points w’ere made in this case by the counsel. First, whether the circumstances of the occupant, anterior to the first day of May, 1806, could be taken into view. Secondly, whether the caveatee comes within the act, of 1806, ch. 3, § 2. Thirdly, how the survey in this case should be made. First, whether the circumstances anterior to the first day of May, 1806, can be taken into view. It is considered that they cannot, for previous to this time the Legislature seems to have taken no notice of them, by considering them trespassers before that time, or as having performed meritorious services; and it would be foreign to the spirit of the act, to take into consideration the agreements, contracts, or disputes of the parties in relation to their claim under *137 the same, as thereby particular cases might be brought into view, to the exclusion of general principles, on which, in contemplation of law, titles should always depend. Secondly, whether the caveatee comes within the act of 1806, ch. 3, § 2. The act says, “ That any person or persons who have seated him, her, or themselves on any vacant and unappropriated land within the jurisdiction of this State, and who were in actual possession of the same at or before the first day of May, in the present year,” &c. It is contended, according to the true construction of these words, the caveatee, John Gilliam, is not comprehended; that he cannot be considered as a person who may have seated himself on vacant lands, &c., and in actual possession, but negative the idea of being in possession by a son, servant, agent, or other person on his behalf. If this be the true construction, to what length would it go? It would go this length, it is conceived ; that if he were not in actual possession by his person on that day, as if he were gone to court, muster, or upon other business off the * premises, he would not satisfy the law, notwithstanding his possession was continued by his family, if he had one, by his servants, if he had any, and by his property, if he had neither. But the act could not mean the corporeal possession before stated, as being the qualification upon which the benefit of the act depended, as thereby its operation might be narrowed by accident, and its extent limited by contingency, in direct opposition to the manifest scope and intention of the act. The object perhaps was, to give the preference to those who had taken possession with a view to the making of a crop on the land that season ; and actual possession on the first day of May was considered as sufficient evidence of that intent. Now what kind of possession evidenced this intent? A possession by a part of a man’s family would be as conclusive of this as that of the man himself, especially such a part of his family as the law considers under his direction and control, as an infant son, a servant, whose services he is entitled to command, and the benefits and product of them to receive. In this case, the caveatee’s son Lemuel, being under age, having come there with his father’s negro, and being there at and before the first of May, 1806, and having the same season made a crop, which was enjoyed by the caveatee, on the premises, is considered an actual possession by the caveatee within the act of Assembly. But the case cited at the bar from *138 Kingston, of John Smith T is considered as having decided the principle of the present case. There the court looked into the nature of the possession of Smith’s tenant, and finding it a tenancy, rejected his claim. This settles thé present case, for it authorizes us to look into the possession of Lémuel Gilliam, and the moment we do this, we cease to have a doubt, upon the facts agreed, who is in actual possession. The caveatee is entitled on another ground, which I will barely mention. From the relationship between the son Lemuel and his father in this case, the infancy * of the son, the residence of the father’s negro with the son, and the subsequent enjoyment'of the crop and premises by the father, he may be considered as the assignee of the son under the act, and in this way entitled to a right of occupancy. In adverting to the facts agreed upon in this case, it seems that both these parties are in such an actual possession as to entitle each to the benefit of a light of occupancy, by virtue of his possession, to a distinct spot, which, not being at a sufficient distance from that of the other to permit the survey of each to be in a square,'with the improvement in the centre, without interference, it seems a question which shall give place, and raises a third point in this cause, how the survey is to be made. This depends on the same act of 1806, ch. 3, § 2, which says, “ such occupant shall include his improvement in the centre of a square.” The caveatee having the elder entry, hath the prior right of survey. But the caveator says that the caveatee hath not, in this case, surveyed according to the requisition of the act, by placing his improvement in the centre, and running his lines equidistant therefrom, so as to include the quantity given by the entry ; but has surveyed in such a manner as to place his improvement between the centre of his survey and the caveator’s claim, by which the interference is rendered much less than if he had surveyed by placing his improvements in the centre ; and the caveator objects to this, and says, that as the caveatee hath not pursued the act, the survey is void. To this it is answered, that it is true the survey should pursue the act and be conformable thereto, otherwise it is void as far as it deviates therefrom; that is to say, by including land not warranted by the act, to the extent of such unauthorized included part, but no further. And the survey in this case including the unauthorized .part not on the side of the caveator, but on the other side the most remote from him, thereby *139 receding from, instead of encroaching upon * the caveator, he is not thereby injured, and without an interest in him, is not competent to raise the objection. I am for affirming the judgment of the Circuit Court.
Roane, Judge.
From the facts found and agreed, it appears that Lemuel Gilliam, son of the caveatee, being under age, by the direction of his father, who also placed a slave under his charge, was seated on and in actual possession of the land in dispute, at and before the first day of May, 1806, made a crop there, and continued in possession until the following January, when his father, who had removed, with the rest of his family, to East Tennessee, took possession, and L. Gilliam delivered up to him the crop, &c., and set up no claim to a preference for himself. Gilliam, the caveatee, made an entry for 200 acres, on the third of August, 1807, No. 15. Morris was also actually seated on the land on the first of May, 1806, about 100 yards from where Gilliam resided, and also made his entry on the third of August, 1807, No. 33, and has entered a caveat against the claim of Gilliam, alleging that he is entitled to a preference by prior occupancy. About 57 acres of land is included in both surveys. Morris’s survey .is made, including his improvement, in the centre of a square. Gilliam’s is not in the centre, but if it had been, the survey would have included all the same land now in dispute, and more of the land claimed by Morris. Various facts are stated which took place prior to the first of May, 1806. The questions presented for the consideration of the court are, first, whether in'determining the right of preference by occupancy, the court can go further back than the first of May, 1806, and inquire into the circumstances respecting the possession which took place prior to that day. Secondly, whether the possession of L. Gilliam, on behalf of his father, is such as is contemplated by the act of 1806. Thirdly, whether Gilliam, the caveatee, by a non-compliance with the direction of the act to * survey so as to include the improvement in the centre of a square, ought to be prevented from holding the land in dispute, all of which would have been included, had the entry and survey been- made so as to include those improvements in the centre. On the first point,-the law is believed to have been settled. The people residing south of French Broad and Holston, by the Constitution of this State, were entitled to the right of preemption and occupancy in that tract. In deciding on these claims, *140 the courts uniformly l’efused to admit any inquiry as to the priority of possession before the 6th of February, 1796, the date of the Constitution. On the same principle, occupancy, under the act of1806, to give a right of preference, must have existed at and before the first day of May preceding. A settlement on lands subsequent to that time was not recognized as giving any right of preference. Until the law passed, all those settlers were considered as trespassers. The Legislature might have refused their sanction to such intrusion. There was no moral obligation to give them any privileges on account of meritorious services ; but as many families were settled on vacant lands, it was thought proper, to prevent the confusion that might arise from removing them or permitting others to acquire a title and eject them from the lands, to give them a preference of a small tract, and thus enable them to secure a peaceable residence for themselves. The Legislature, therefore, having placed all who were settled on the first day of May, 1806, on an equal footing, the court cannot make any distinction between them. On the third point, no real difficulty is supposed to exist. Gilliam did not make his entry and survey so as to include his improvement in the centre of a square ; that is, he included in his survey nearly 100 acres less of the land claimed by Morris than he would otherwise have done. Can Morris complain on that account ? It is believed he cannot. If a man does not pursue the direction of the law in * his survey, he, and he alone, is authorizéd to complain who is injured by that deviation. But the principal point insisted on in this case is, that, by the law of 1806, he who claims a right of preference must have seated himself and have been in actual possession at and before the first of May preceding, or as assignee of some person so possessed. The expressions used b}"- the Legislature seem to imply something more than having stock or property there ; something more than occasionally bestowing his labor on the lands ; something more than sending slaves there to reside and labor for him, while he has an actual residence and domicile elsewhere. If any or all of these things were done, the Legislature did not recognize them as giving a right of preference, nor could it be foreseen what they would do on that subject. It seems to me that some person must have been seated on the lands, and in actual possession, capable of taking a benefit from the act: and whether he was in possession for himself, or by contract for another, the preference, so far as third *141 persons are concerned, will be considered as cast on him who was in actual possession. Nor can those third persons complain of any injury done to them, if the resident surrenders his possession to another, vests him with the rights conferred on that possession, and claims nothing for himself. In this situation I am inclined to think Lemuel Gilliam was placed. If the possession had been on his own account, the right of preference would have been completely secured to him; but having been put in possession by his father, and in that situation having acquired the right, he was under moral obligations not to defeat the purpose for which he was placed there, but to relinquish all claim on his own account, and by delivery of possession and the fruit of his industry, transfer to his father all the advantages which had accrued by virtue of that occupancy. And it is not considered as straining the construction of the act too far to say, that his father, the caveatee, should, from* the time possession was taken by him, be considered as the assignee of his son, the former occupant. Though no express contract is stated in the facts agreed, yet the circumstances stated may be considered as evidence of an assent by Lemuel Gilliam ; and it is not necessary such assent should be in writing, to make it effectual. This construction of the act will place John Gilliam, the caveatee, as assignee of his son Lemuel, on an equality with Morris, the caveator; and Gilliam having a priority of entry, the court cannot interfere and take it from him, for the purpose of vesting it in Morris. The judgment of the Circuit Court must therefore be affirmed.

And it was affirmed.

See Cooke v. Shute, Cooke 67; Smith v. Cain, 2 Tenn. 196; King’s Digest, 8034-36.